**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| In re: | * | (Chapter 11) |
| **LUMINENT MORTGAGE CAPITAL, INC., et al.,** | * | Case Nos.  08-21389-DK Through 08-21398-DK |
| | * | |
| Debtors. | * | Jointly Administered Under |
| | * | Case No. _____ |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DECLARATION OF ZACHARY H. PASHEL IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Zachary H. Pashel, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true to the best of my knowledge, information and belief:

1.      I am the President and Chief Executive Officer of Debtor Luminent Mortgage Capital, Inc. ("Luminent" or the "Company") and President of each of the subsidiary debtors (the "Subsidiary Debtors," and together with Luminent, the "Debtors").  In that capacity, I have personal knowledge of (i) the Debtors' financial condition, businesses, operations, policies and procedures, (ii) the events leading to the filing of these chapter 11 cases, and (iii) the other matters set forth herein.  I am authorized to make this declaration on behalf of the Debtors.

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing a petition for relief in the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court").

## II. <u>Factual Background</u>

A.    **The Debtors' Business and Corporate Structure**

3.    Luminent is a Maryland corporation that was organized on April 25, 2003 and commenced operations on June 11, 2003. The Company's common stock began trading on the New York Stock Exchange under the trading symbol "LUM" on December 19, 2003. The NYSE suspended the listing of the Company's stock effective May 2, 2008 due to the Company's inability to meet the stock price and capitalization requirements for continued listing on the exchange. Subsequently, the Company's stock began to be quoted on the Over-the-Counter Bulletin Board under the trading symbol "LUMC."

4.    Luminent is the ultimate parent company of the Subsidiary Debtors and operates as a real estate investment trust, or REIT, with its headquarters located in Philadelphia, Pennsylvania. Luminent is an asset management company that historically invested in prime whole loans, U.S. agency and other highly-rated, single-family, adjustable-rate, hybrid adjustable-rate and fixed-rate mortgage-backed securities, which it acquired in the secondary market. Luminent and the Subsidiary Debtors are no longer engaged in active business operations.

5.    Luminent Capital Management, Inc. ("<u>Luminent Capital</u>") is a Delaware corporation that is a wholly-owned subsidiary of the Company. Luminent Capital acts as a collateral manager with respect to CDO's (collateralized debt obligations). Mercury Mortgage Finance Statutory Trust ("<u>Mercury</u>") is a Maryland Business Trust that is wholly-owned by Luminent and historically held all whole mortgage loan purchases intended for owner trust securitizations. Mercury was also created to hold a portion of all mortgage-backed securities purchased from third parties and rated below AAA. Proserpine, LLC ("<u>Proserpine</u>") is a

Pennsylvania limited liability company that is wholly-owned by Mercury. Proserpine performed investment and management services for Luminent, Mercury, Saturn (as defined below), Maia (as defined below), and Minerva (as defined below) pursuant to a management agreement.

6.    Debtor Pantheon Holding Company, Inc. ("Pantheon") is a Delaware corporation that is wholly-owned by Luminent. Pantheon acted as a holding company for three other entities and is a qualified REIT subsidiary. Maia Mortgage Finance Statutory Trust ("Maia") is a Maryland Business Trust wholly-owned by Pantheon that held all whole mortgage loan purchases intended for REMIC securitizations. Saturn Portfolio Management, Inc. ("Saturn") is a Delaware corporation wholly-owned by Pantheon that held all non-whole pool agency mortgage-backed securities and all AAA mortgage-backed securities. Minerva Mortgage Finance Corporation ("Minerva") is a Maryland corporation wholly-owned by Pantheon that (i) held created and retained securities from owner trust and REMIC securitizations, (ii) held a portion of all mortgage-backed securities purchased from third parties and rated below AAA, and (iii) held agency mortgage-backed securities. Minerva CDO Delaware SPV LLC ("Minerva CDO") is a Delaware corporation wholly-owned by Minerva that holds the equity of a certain CDO called Charles Fort CDO I.

7.    Debtor OT Realty Trust ("OT") is a Maryland real estate investment trust and a subsidiary of Minerva that has approximately 100 preferred equity investors. OT owns owner trust certificates and equity notes in the Delaware statutory trust and is treated as a qualified REIT subsidiary for tax purposes.

8.    In 2005, the Company expanded its mortgage loan investment strategy from a holding agency for AAA-rated mortgage-backed securities to include mortgage loan acquisition and securitization, as well as investments in mortgage-backed securities with credit ratings below

AAA.  In 2007, the Company's strategy grew to include an asset management portfolio, starting with collateralized debt obligations (CDO's).  Using a combination of these investment strategies, the Company sought to acquire mortgage-related assets, finance these purchases in the capital markets and use leverage in order to provide an attractive return on stockholders' equity.

9.      The Company, together with its subsidiaries, has historically invested in two core mortgage investment strategies.  Under its "Residential Mortgage Credit" strategy, the Company invested in mortgage loans purchased from selected high-quality providers within certain established criteria as well as subordinated mortgage-backed securities and other asset-backed securities that have credit ratings below AAA.  The Company's Residential Mortgage Credit portfolio consisted of mortgage-backed securities rated below AAA.  Under its "Spread" strategy, the Company invested primarily in U.S. agency and other highly-rated single-family, adjustable-rate and hybrid adjustable-rate mortgage-backed securities.  The Company's Spread portfolio consisted of AAA-rated and agency-backed mortgage-backed securities.

10.      The Company is not a "subprime originator."  Luminent does not acquire subprime mortgage loans.  Since it is not a direct originator of mortgage loans, it is not subject to "early payment default" claims.  The Company historically acquired mortgage loans exclusively from well-capitalized originators, who meet the Company's standards for financial and operational quality.

11.      Luminent has elected to be taxed as a REIT under the Internal Revenue Code of 1986, as amended.  As such, the Company routinely distributes substantially all of the REIT taxable net income generated from its operations to its stockholders.

12.      On March 28, 2008, the Company announced its intention, subject to stockholder approval, to convert from a Maryland corporation qualified as a REIT to a publicly-traded

partnership ("PTP").  In anticipation of this conversion, the Company formed a new REIT subsidiary, OT, to hold certain retained interests of securitization trusts that are required to be held by a REIT in accordance with the trust documents.  Third-party investors hold the preferred stock of OT and Minerva owns the common stock of OT.

**B.     The Debtors' Capital Structure**

      **1.     Arco Secured Credit Facility**

13.     Beginning in August 2007, the Company entered into a number of financing transactions with Arco Capital Corporation Ltd. ("Arco") and issued a warrant (the "Warrant") to Arco enabling it to acquire a 51% economic interest in the Company.  Arco has not exercised the Warrant.  Continuing into 2008, the Company continued to shift financing from short-term arrangements that are subject to margin calls to long-term financing and financing provided by related parties.  The Company's main source of liquidity is monthly principal and interest payments on debt as well as to pay expenses required to support the Company's operations.

14.     Luminent is a party to (a) that certain Amended and Restated Credit Agreement dated as of September 26, 2007 as amended by the First Amendment to the Amended and Restated Credit Agreement dated as of December 7, 2007, the Second Amendment to the Amended and Restated Credit Agreement dated as of May 9, 2008, the Third Amendment to the Amended and Restated Credit Agreement dated as of June 16, 2008 (the "Credit Agreement"), by and between Luminent as borrower, each of Mercury, Pantheon, Maia, Saturn, Minerva, OT, Luminent Capital, Proserpine, and Minerva CDO (collectively, the "Obligors") as guarantors, and Arco as the Lender, and (b) certain documents ancillary to the Credit Agreement (such documents, collectively with the Credit Agreement, the "Credit Agreement Documents").  Pursuant to the Credit Agreement Documents, Arco agreed to provide a revolving credit facility

to Luminent in the amount of up to $60,000,000.00. As of the Petition Date, the total amount due and owing to Arco under the Credit Agreement is in excess of approximately $28,883,346.00. The line of credit under the Credit Agreement is secured by all of the assets of the Company that are not subject to a previous security interest and is guaranteed by each of the Subsidiary Debtors.

**2.      Expansion Term Loan**

15.      Debtors Saturn and Minerva are parties to (a) that certain Credit Agreement dated as of June 16, 2008 (the "Expansion Term Loan Agreement"), by and between Arco, Saturn and Minerva as borrowers, Sovereign Bank, NA, as lender, and Luminent as guarantors and (b) certain documents ancillary to the Expansion Term Loan Agreement (such documents, collectively with the Expansion Term Loan Agreement, the "Expansion Term Loan Agreement Documents"). The total amount outstanding under the Expansion Term Loan Agreement as of the Petition Date is approximately $14.1 million.

**3.      Repurchase Agreements**

16.      Debtor Saturn, as seller, and GGRE, LLC ("GGRE" and together with Arco, the "ACC Parties") as buyer, are party to that certain Master Repurchase Agreement dated as of August 14, 2007, Mercury, as seller, and GGRE, as buyer, are party to that certain Master Repurchase Agreement dated as of August 14, 2007, Minerva, as seller, and GGRE, as buyer, are party to that certain Master Repurchase Agreement dated as of August 14, 2007, and Minerva SPV, as seller, and GGRE, as buyer, are party to that certain Master Repurchase Agreement dated as of December 6, 2007 (such Master Repurchase Agreements collectively, the "MRAs"). The MRAs generally serve as a form of secured financing for the Debtors as the Debtors have transferred mortgage-backed securities and whole-loan portfolios to the counter-party at an

agreed upon discount to the face value of such mortgage loan or securities. The Debtors then retain the right to repurchase those securities and loan portfolios pursuant to the repurchase provisions of the MRAs. As of the Petition Date, the total amount outstanding under the MRAs is in excess of approximately $184,054,107.00.

### 4.    Term Notes with WaMu and Greenwich

17.    WAMU Capital Corporation ("WAMU") is the holder of that certain Promissory Note, dated, May 15, 2008, in the original principal amount of $13,000,000.00 (the "WAMU Term Note"), representing a portion of the deficiency claims with respect to repurchase agreements with Mercury and Minerva that were guaranteed by Luminent and that were previously closed out by WAMU following a default and/or an event of default thereunder. The total amount outstanding under the WaMu Term Note as of the Petition Date is in excess of approximately $13,000,000.00.

18.    Similarly, Greenwich Capital Financial Products, Inc. ("Greenwich") is the holder of that certain Promissory Note, dated June 2, 2008, in the original principal amount of $10,000,000.00 (the "Greenwich Term Note"), representing the deficiency claim against Luminent with respect to certain repurchase agreements with certain of Luminent's subsidiaries and corresponding guarantees by Luminent. The total amount outstanding under the Greenwich Term Note as of the Petition Date is in excess of approximately $10,000,000.00.

### 5.    Senior Convertible Notes

19.    In June 2007, Luminent completed a private offering of $90.0 million of convertible senior notes (the "Convertible Notes") that are due in 2027 with a coupon of 8.125%. In connection with the offering, Luminent is a party to that (a) certain Indenture dated as of June 5, 2007 (the "Senior Note Indenture"), by and between Luminent as issuer, Maia, Mercury and

Saturn as guarantors, and certain holders of the 8.125% Convertible Senior Notes issued pursuant to the Senior Note Indenture, and (b) certain documents ancillary to the Senior Note Indenture (such documents, collectively with the Senior Note Indenture, the "Senior Note Indenture Documents").  The Convertible Notes issued under the Senior Note Indenture bear interest at the rate of 8.125% per year, payable on June 1 and December 1 of each year, beginning in December 1, 2007.  The Convertible Notes will mature on June 1, 2027.  Wells Fargo Bank, N.A. (the "Trustee") serves as indenture trustee under the Senior Note Indenture with the following entities or individuals as holders:  JMG Triton Offshore Fund, Ltd., William Stern, Watershed Capital Partners, L.P., Watershed Capital Partners (Offshore), Ltd., WCIP Cayman, Ltd., Vicis Capital LLC, Argent Funds Group, Waterstone Market Neutral Master Fund Ltd., Waterstone Market Neutral MAC, Bayerische Hypo-Und Vereinsbank AG, Rreef Reflex Master Portfolio Ltd., CHN Master Account, L.P, AQR Absolute Return Master Account, L.P., DBX Convertible Arbitrage 13 Fund, JP Morgan Securities Inc. and Jack Cregan (collectively, "Convertible Noteholders").

20.    Prior to June 1, 2026, upon the occurrence of specified events, as defined in the Senior Note Indenture Documents, primarily related to the price of Luminent's common stock or change of control transactions, the Convertible Notes are convertible at the option of the holder at an initial conversion rate of 89.4114 shares of Luminent's common stock per $1,000 principal amount of the Convertible Notes.  On or after June 1, 2026, the Convertible Notes are convertible at any time prior to maturity at the option of the holder.  Upon conversion of the Convertible Notes by a holder, the holder will receive cash up to the principal amount of such Convertible Notes and, with respect to the remainder, if any, of the conversion value in excess of such principal amount, at the option of the Company in cash or in shares of the Company's

common stock.  Prior to June 5, 2012, the Convertible Notes are not redeemable at Luminent's option, except to preserve the Company's qualification as a REIT.  On or after June 5, 2012, the Company may redeem all or a portion of the Convertible Notes at a redemption price equal to the principal amount plus accrued and unpaid interest, including additional interest, if any.  As of March 31, 2008, the Company is paying an additional interest rate penalty of 0.50% per annum on the Convertible Notes because the Company has not filed a registration statement with the U.S. Securities and Exchange Commission (the "SEC") to register the securities associated with the convertible debt.

### 6.    Junior Subordinated Notes

21.    Luminent is party to (i) that certain Junior Subordinated Indenture between Luminent Mortgage Capital, Inc. and JPMorgan Chase Bank, National Association, as Trustee, dated March 15, 2005 Junior (the "Trups Indenture I"), and (ii) that certain indenture between Luminent Mortgage Capital, Inc. and Wilmington Trust Company, as Trustee, dated December 15, 2005 (the "Trups Indenture II," and together with the Trups Indenture I, the "Trups Indentures").  Pursuant to the Trups Indentures, the junior subordinated notes consist of 30-year notes issued in March and December of 2005 to Diana Statutory Trust I ("Diana I") and Diana Statutory Trust II ("Diana II," and together with Diana I, the "Diana Trusts"), respectively.  The debt issued through the Trups Indentures consists of structurally subordinate, unsecured notes or trust preferred securities.  These Diana Trusts are unconsolidated affiliates of the Company formed to issue $2.8 million of the trusts' common securities to the Company and to place $90.0 million of preferred securities privately with unrelated third-party investors.  The Company pays interest to the Diana Trusts quarterly.  The Diana Trusts remit dividends pro rata to the holders of

the common and preferred trust securities based on the same terms as the junior subordinated notes.

**C.     Events Leading to Chapter 11 filing**

22.     During the summer of 2007, the mortgage industry and the financing methods the industry had historically relied upon deteriorated significantly and in an unprecedented fashion. Effectively, the secondary market for many fixed income securities especially mortgage-backed securities closed, and, as a result, the Company simultaneously experienced a significant increase in margin calls from its repurchase agreement counterparties, or repurchase agreement lenders, and a decrease in the amount of financing its lenders would provide on a given amount of collateral. Prices for even the highest quality AAA-rated bonds dropped precipitously. These events resulted in a rapid and significant loss of liquidity forcing the Company to sell investment assets at significant losses and write down investments held in its portfolio to reflect reductions in the fair value of the investments.

23.     As was well publicized in the media, during the last eighteen months, the subprime mortgage market experienced a period of substantial market deterioration. Subprime mortgage loans, which amounted to approximately twenty percent of the nation's mortgage lending in 2006, saw delinquency rates rise to where they ended up five times higher than the delinquency rates for prime borrowers. In reaction to the rising delinquency rates, mortgage lenders tightened lending standards across the board, thereby reducing the options available to homeowners who may be facing potential rate adjustments and who have a desire to refinance. The lack of available capital also has served to depress overall home prices, thereby devaluing the collateral securing the obligations under the mortgages, as the pool of potential purchasers that qualify for financing to acquire a home has shrunk.

**D.      Plan Support and Forbearance Agreement**

24.      Defaults and/or events of default that would, with the passage of time, constitute a default have occurred under various of the Debtors' credit facilities (the "Credit Facilities") described above, including the Credit Agreement Documents, the Expansion Term Loan Agreement Documents, the MRAs, the Senior Note Indenture Documents, the Trups Indentures, and the WAMU Term Note.  As a result of the existing defaults under the MRAs, GGRE closed out and otherwise exercised its contractual remedies under the MRAs, and the ACC Parties exercised their rights to (i) take control of various of the Debtors' deposit accounts (collectively, the "Frozen Deposit Accounts"), and (ii) receive payment of some or all of the funds on deposit in the Frozen Deposit Accounts (the "Frozen Deposit Account Funds").

25.      After good faith, arms' length negotiations, the Debtors, the ACC Parties, WAMU, the Trustee and the Convertible Noteholders (collectively, the "Creditors" and together with the Debtors, the "Parties") agreed to engage in various transactions intended to restructure and recapitalize the Debtors (collectively, the "Restructuring Transactions").  In connection with documenting the agreement regarding the Restructuring Transactions, the Parties entered into that certain Plan Support and Forbearance Agreement, dated September 4, 2008 (the "Lockup Agreement"), a copy of which (including all exhibits) is attached to this Declaration as Exhibit 1.

26.      In order to implement the Restructuring Transactions, (i) the Debtors agreed to commence these voluntary bankruptcy cases and seek confirmation of a plan of reorganization (the "Plan") that contains the terms and conditions set forth on Exhibit A to the Lockup Agreement (the "Plan Term Sheet"), (ii) the ACC Parties agreed to (a) provide a debtor-in-possession financing facility to the Debtors in accordance with the timetable and amounts contained in the budget set forth in Exhibit B to the Lockup Agreement, and on the terms and

conditions set forth in Exhibit C to the Lockup Agreement (the "DIP Financing Term Sheet"), (b) fund the payment on the effective date (the "Effective Date") of the Plan of cash distributions to general unsecured creditors under the Plan in the amount of $2.75 million (the "GUC Distributions"), in exchange for the issuance to the ACC Parties or their designees of a commensurate amount of preferred stock or other equity interests entitled to a liquidation preference in the reorganized Debtors containing the terms and conditions set forth in the Plan Term Sheet (such equity interests, the "Preferred Stock"), (c) fund the payment on the Effective Date of the Plan of cash distributions to small unsecured trade creditors classified in a convenience class under the Plan in the amount of no more than $300,000.00 (the "Convenience Class Distributions"), (d) fund the payment on the Effective Date of the Plan of a cash distribution to the IRS for the settlement of all federal tax claims entitled to priority under Section 507(a)(8) of the Bankruptcy Code (the "Federal Tax Claims") with respect to the Debtors for an amount no greater than $1 million (together with the GUC Distributions and the Convenience Class Distributions, the "Plan Distributions"), and (e) provide post-confirmation financing to the reorganized Debtors in accordance with the timetable and amounts set forth on Exhibit D to the Lockup Agreement (the "Post-Confirmation Financing Term Sheet").    In connection with and as consideration for the ACC Parties' release of the Frozen Deposit Accounts, the release of the Frozen Deposit Account Funds, the commitment to provide DIP Financing and Post-Confirmation Financing and the commitment to fund the Plan Distributions, the Debtors and each of the Creditors to the Lockup Agreement have agreed to release each of the ACC Parties from any and all claims pursuant to the terms and conditions as set forth in the Lockup Agreement.

27.     In order to facilitate the Restructuring Transactions, each of the Creditors agreed to forbear in exercising their respective remedies against the Debtors and to cast all votes that it or any of its affiliates is entitled to cast to accept the Plan.  Pursuant to the Lockup Agreement, the Debtors will be filing the Plan and a related disclosure statement (the "Disclosure Statement") with the Bankruptcy Court no later than five business days after the Petition Date and will seek to obtain confirmation of the Plan as soon as reasonably practicable, and to cause the effective date of the Plan to occur on or before January 30, 2009.

### III.  **First Day Relief**

I have reviewed the facts set forth in each of the motions and applications discussed herein, and they are true and accurate to the best of my knowledge, information and belief.  Set forth below are facts in support of those motions, highlighted for the convenience of the Court.

### A.     **Motion of the Debtors and Debtors-in-Possession For An Order Authorizing Joint Administration of Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(b)**

28.     By motion filed concurrently herewith, the Debtors are requesting to have their estates jointly administered pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are seeking joint administration of their chapter 11 cases because each of the Debtors are affiliates, as that term is defined in section 101(2) of the Bankruptcy Code, by virtue of Debtor Luminent being the direct or indirect parent  of each of the Subsidiary Debtors.

29.     Because of their affiliate status, it is my understanding that joint administration of the Debtors' estates will be less costly and burdensome than the separate administration of the estates.  For example, I understand that joint administration will permit the use of a single general docket for the Debtors' cases and combined notices to creditors and other parties in interest of the Debtors' respective estates.  The Debtors believe it likely that numerous filings

and additional matters, including notices, applications, motions, orders, hearings and other proceedings will be made, issued, or convened in these cases. Many of these will affect all of the Debtors. Therefore, joint administration will protect the parties in interest by ensuring that parties affected by each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in their cases.

30.     I believe that the rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these chapter 11 cases because the motion requests only administrative consolidation of the Debtors' estates, and the Debtors are not seeking substantive consolidation. Each creditor will be required to file a proof of claim against a particular Debtors' estate. Motions and other pleadings, however, may be jointly filed. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, I believe supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will be greatly simplified. Accordingly, I believe that joint administration is in the best interests of the Debtors, their creditors, and all parties in interest.

**B.     Motion Of The Debtors And Debtors-In-Possession For Entry Of An Order Authorizing The Debtors (I) To File a Consolidated Creditors Matrix and (II) To File A Consolidated List Of Top Thirty (30) Unsecured Creditors**

31.     By motion filed concurrently herewith, the Debtors are seeking entry of an order authorizing the Debtors (i) to file a consolidated creditors matrix and (ii) to file a list of their top thirty (30) unsecured creditors on a consolidated basis.

32.     I believe that the relief sought in this motion is appropriate and in the best interest of the Debtors, their creditors, and all parties in interest. I am informed by the Debtors'

bankruptcy counsel that each debtor must file a master mailing matrix containing the names and addresses of the debtor and all of its creditors.  Given the nature of the Debtors' computerized lists of the names and addresses of their respective creditors, the Debtors believe that the information, as maintained in their computer files, may be consolidated and utilized efficiently to provide interested parties with the notices and other similar documents.  Accordingly, the Debtors seek authority to file a consolidated creditors matrix in each of their cases that identifies their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.  Furthermore, given the nature of the Debtors' businesses, the Debtors believe that filing a consolidated list of creditors holding the thirty (30) largest unsecured claims would facilitate the United States Trustee's review of creditors' claims.  By contrast, the filing of an individual list of creditors holding the twenty (20) largest unsecured claims for each of the Debtors actually would impose an unnecessary burden on the United States Trustee's office without providing any benefit.

**C.  Application of the Debtors and Debtors-in-Possession For Entry of an Order Authorizing the Employment and Retention of Hunton & Williams LLP as Counsel to the Debtors *Nunc Pro Tunc* To The Petition Date**

33.  By application filed concurrently herewith, the Debtors are requesting authority to retain Hunton & Williams LLP ("H&W") as their co-counsel in these cases (the "H&W Retention Application").  The Debtors seek to retain H&W as their attorneys because of H&W's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Based upon H&W's experience in representing the Debtors before the Petition Date, together with the above experience, I believe H&W is able to quickly and effectively respond to all issues that may arise in these cases.  In preparing for these cases, and in addition to its prior representation of the Debtors, H&W has

become familiar with the Debtors' business affairs, legal affairs, financial structure and many of the potential legal issues that may arise in the context of these chapter 11 cases. Accordingly, I believe H&W is both well qualified and uniquely able to represent the Debtors in an efficient and timely manner.

**D.    Application of the Debtors and Debtors-in-Possession For Entry of an Order Authorizing the Employment and Retention of Shapiro, Sher, Guinot & Sandler as Counsel to the Debtors *Nunc Pro Tunc* To The Petition Date**

34.    By application filed concurrently herewith, the Debtors are requesting authority to retain Shapiro, Sher, Guinot & Sandler ("Shapiro Sher") as their co-counsel in these cases (the "Shapiro Sher Retention Application"). The Debtors seek to retain Shapiro Sher as their attorneys because of Shapiro Sher's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In preparing for these cases, Shapiro Sher has worked with H&W to become familiar with the Debtors' business affairs and many of the potential legal issues that may arise in the context of these chapter 11 cases. Shapiro Sher maintains an office in the District of Maryland and has experience in bankruptcy and experience practicing before this Court. Accordingly, I believe Shapiro Sher is both well qualified and able to represent the Debtors in an efficient and timely manner.

**E.    Motion Of The Debtors And Debtors-In-Possession For Entry Of An Order Pursuant To Sections 105, 363, 364 and 507 of the Bankruptcy Code And Bankruptcy Rules 2002, 4001 and 9014, (A) Authorizing The Debtors To Obtain Post-Petition Secured Financing On An Interim and Final Basis, (B) Approving Agreements Relating To The Foregoing, (C) Scheduling A Final Hearing And Prescribing The Form And Manner Of Notice, And (D) Granting Related Relief**

35.    As a result of, among other things, the commencement of these cases, the Debtors have an immediate need for financing to allow them to continue to operate their businesses without disruption. By the above-referenced motion, the Debtors are seeking interim and final

orders approving the secured debtor-in-possession loan facility (the "DIP Facility") with Arco

Capital Corporation Ltd. ("Arco" or the "Lender") to address the Debtors' anticipated working

capital needs.  The Lender has agreed to lend up to $3.242 million to the Debtors in accordance

with an agreed upon cash-flow budget (the "Budget") that reflects post-Petition Date operating

and reorganization expenses.  As collateral security for the Debtors' obligations under the DIP

Facility to the Lender, the Lender shall be granted (i) pursuant to section 364(c)(1) of the

Bankruptcy Code, an allowed administrative expense claim having priority over any and all

administrative expenses, (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, a first

priority security interest in, and lien on, all or substantially all of the Debtors' assets (including

causes of action under chapter 5 of the Bankruptcy Code) that are not subject to an existing,

validly perfected lien; and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior

lien on the Debtors' assets that are subject to an existing, validly perfected lien.

36.    It is essential that the Debtors obtain immediate post-petition financing and thus

the Debtors are seeking an interim order at the first day hearing for authority to access

$750,000.00 of the DIP Facility during the first fifteen days of these Bankruptcy Cases. The

relief requested on an interim basis will enable the Debtors to continue their ordinary course,

day-to-day operations, to preserve the value of their estates, and to facilitate the Debtors' ability

to reorganize successfully.  Immediate access to credit under the DIP Facility is necessary to

provide working capital during the pendency of these chapter 11 cases to deal with the liquidity

constraints facing the Debtors as of the commencement of these cases and to provide

counterparties to various agreements, employees, and other key constituencies with confidence

that the Debtors have sufficient resources available to maintain their operations in the ordinary

course.  Specifically, the funds sought by the Debtors on an interim basis will fund payroll, day-

to-day operations, and be used to facilitate the restructuring contemplated in the Lockup Agreement. Furthermore, the Debtors have numerous new business initiatives that they plan to initiate once the appropriate funds are in place. The primary focus of these new initiatives is providing asset management services. However, over the last several months, the Debtors have been met with recurring trepidation from potential partners and investors due to financial instability. Without the immediate relief sought in the interim order, the Debtors likely will suffer employee losses, will not be able to recruit new employees, and will not have the funds necessary to introduce new business initiatives. Additionally, without immediate access to funds under the DIP, the Debtors will not be able to satisfy their obligations under the Lockup Agreement and facilitate the restructuring contemplated thereby.

37.    Accordingly, without immediate access to post-petition financing, the Debtors could suffer substantial and irreparable harm, which could threaten their ability to reorganize successfully. By contrast, once the DIP Facility is approved, the Debtors ability to minimize disruption to their business operations, protect the value of their portfolios, and instill confidence in their various stakeholders will be substantially enhanced. The Debtors' need for access to the DIP Facility, therefore, is urgent. In addition, because the Debtors lack sufficient unencumbered funds to meet certain imminent expenses necessary for a smooth transition to chapter 11, it is essential that they obtain interim financing under the DIP Facility before the Court conducts a final hearing on the motion.

**F.    Motion of the Debtors and Debtors-in-Possession for an Order Authorizing (I) the Continued Maintenance of Existing Bank Accounts;(II) the Continued Use of Existing Business Forms; and (III) the Waiver of the Investment and Deposit Requirements of Section 345 of the Bankruptcy Code**

38.    By this motion, the Debtors request authority to maintain their nineteen (19) pre-Petition Date bank accounts (collectively, the "Accounts") in the ordinary course of their

business.  I believe that the financial institutions at which the Debtors maintain their Accounts are financially stable banking institutions.

39.     The Debtors maintain current and accurate accounting records of daily cash transactions, including without limitation transactions between and among the Debtors, if any, and submit that preservation of the Accounts will prevent undue disruption to the Debtors' business operations, while protecting the Debtors' cash for the benefit of their estates.  All funds received or disbursed for each company are properly reflected on that Debtors' books and records.  Accordingly, I believe that maintaining the Debtors' Accounts is crucial to their smooth transition into chapter 11.  Further, absent the relief requested in the motion, the Debtors' estates will be required to bear an additional administrative burden and expense, which the Debtors believe is unwarranted and likely will have little or no attendant benefit to their estates or creditors under the facts of these cases.

40.     In addition to requesting authority to maintain their current Accounts, by the motion the Debtors request authority to continue to use their existing Business Forms (as defined herein).  In the ordinary course of their business, the Debtors use a variety of checks, invoices, stationary and other pre-printed business forms (collectively, the "Business Forms").  Changing the Business Forms would be expensive and disruptive to the Debtors' businesses and provide little or no attendant benefit.  Accordingly, the Debtors request authority to continue using their existing Business Forms.

41.     Finally, the Debtors request relief from the requirements of section 345 of the Bankruptcy Code and authority to continue to invest and deposit funds in a safe and prudent manner in accordance with their existing practices.  I am informed by the Debtors' bankruptcy counsel that section 345 of the Bankruptcy Code requires, among other things, that the Debtors'

deposits and investments must be insured or guaranteed by the United States or by a department, agency or instrumentality of the United States, or backed by the full faith and credit of the United States.  If not, then I am informed by the Debtors' bankruptcy counsel, that the entity with whom the funds are deposited must either obtain a bond in favor of the United States or provide United States obligations to the United States Trustee to secure the estates' funds it holds.

42.    The benefits to the Debtors of waiving the Bankruptcy Code section 345(b) requirements far outweigh any potential harm to their estates, and the failure to waive the requirements may needlessly hinder the Debtors' reorganization efforts.  The financial institution at which the Debtors maintain their Accounts, are financially stable banking institutions.  All such deposits are prudent and designed to yield the maximum reasonable net return on the funds invested, taking into account the safety of such deposits and investments and consistent with the Debtors' financing requirements.    Accordingly, I believe that cause exists to waive the investment and deposit restrictions under section 345(b) of the Bankruptcy Code to the extent that the Debtors' Accounts do not strictly comply.

**G.    Motion of the Debtors and Debtors-in-Possession for Entry of an Order (I) Granting an Extension of Time to File Schedules and Statements, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Waiving the Requirement to Provide Notice of the Order for Relief to Equity Security Holders**

43.    By motion filed concurrently herewith, the Debtors are seeking entry of an order, pursuant to are sections 105(a) and 521 of the Bankruptcy Code and Bankruptcy Rules 1007(a), (b) and (c), and 2002(d), (i) extending the fifteen (15) day period to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") for an additional fifteen (15) days without prejudice to the Debtors' ability to request additional time should it become necessary or to seek a waiver of the requirement to file certain schedules, (ii) waiving the requirement to file a list of

equity security holders, and (iii) waiving the requirement to mail notice of the order for relief to all equity security holders (collectively, the "Schedule Extension Motion").

44.     I believe that the relief sought in this motion is appropriate and is in the best interests of the Debtors, their creditors, and all parties in interest.  The conduct and operation of the Debtors' businesses requires the Debtors to maintain voluminous books and records and a complex system of accounting.  Given the size and complexity of their businesses and the fact that certain pre-petition invoices have not yet been received or entered into the Debtors' financial accounting systems, the Debtors have not had the opportunity to gather the necessary information to prepare and file the Schedules and Statements.  Moreover, due to the limited staff available to perform the required internal review of the Debtors' business and affairs, and the numerous other matters incident to the commencement of these cases, the Debtors believe that the fifteen (15) days provided by the Bankruptcy Rules to allow the Debtors to prepare and submit the Schedules and Statements will not be sufficient.  Indeed, it would be onerous, if not impossible, to complete the Schedules and Statements within the time provided.

45.     At the present time, the Debtors believe that they will need a total of thirty (30) days from the Petition Date to complete the Schedules and Statements.  Accordingly, the Debtors have filed the Schedule Extension Motion requesting a fifteen (15) day extension of the deadline beyond the fifteen (15) days provided under the Bankruptcy Rules to file the Schedules and Statements.

46.     Moreover, the Debtors are requesting a waiver of the requirements to file a list of equity security holders with last known addresses (the "Equity List") and to mail a notice of the entry of the order for relief to all parties on the Equity List.  The Debtors believe that complying with these requirements will be extremely expensive and time-consuming.  The Debtors propose

to provide alternative forms of notice that are designed to provide ample notice to equity security holders and enable them to have an opportunity to assert their interests.  The Debtors propose to publish, as soon as practicable after the commencement of these chapter 11 of cases, a notice of commencement of these chapter 11 cases in the national edition of *The Wall Street Journal*. Luminent will be filing a Form 8-K with the United States Securities and Exchange Commission and issuing a press release, whereby it will disclose the filing of the Debtors' bankruptcy petitions.  The Debtors are confident that the publication of the Notice of Commencement, the filing of the Form 8-K, and the national attention these bankruptcy cases will surely receive, will more than adequately inform the equity security holders of these chapter 11 cases.  Accordingly, the Debtors believe that equity security holders would not be prejudiced by the waiver of the requirements to file an Equity List and to send notice of the entry of the order for relief to all parties on the Equity List.

**H.    Motion of the Debtors and Debtors-in-Possession for an Administrative Order, Pursuant to Bankruptcy Code Sections 105(a), 328 and 331 and Rule 2016(a) of the Federal Rules of Bankruptcy Procedure, Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals**

47.    By motion filed concurrently herewith, the Debtors are requesting authority to establish an orderly, regular process for interim approval and payment of compensation and reimbursement of expenses to attorneys and other professionals whose services are authorized by this Court and who will be required to file applications for allowance of compensation and reimbursement of expenses (the "Interim Compensation Procedures Motion").

48.    The proposed procedures as described in the Interim Compensation Procedures Motion will enable the Debtors to closely monitor the costs of administration, maintain a level cash flow, and implement efficient cash management procedures.  Moreover, these procedures will also allow the Court and the key parties in interest to insure the reasonableness and necessity

of the compensation and reimbursement sought pursuant to such procedures.  Accordingly, I believe the relief requested in the Interim Compensations Procedure Motion is appropriate and in the best interest of the Debtors, their creditors and all parties in interest.

I.    **Motion of the Debtors and Debtors-in-Possession for an Order Pursuant to Bankruptcy Rules 2002(m) and 9007 and Bankruptcy Code Section 105(a) Establishing Notice and Service Procedures**

49.    By motion filed concurrently herewith, the Debtors are seeking the entry of a order establishing appropriate notice and service procedures in these cases (the "Notice and Service Procedures Motion").  The proposed notice and service procedures as set forth in greater detail in the Notice and Service Procedures Motion will enable the Debtors to avoid the extraordinary costs and expenses of serving all pleadings and papers filed by the Debtors in these cases on every party in interest, while enabling the Debtors (or their agents) to provide notice to key parties in interest identified on the proposed master service list.  Accordingly, I believe the relief requested in the Notice and Services Procedure Motion is appropriate and in the best interest of the Debtors, their creditors and all parties in interest.

J.    **Motion of the Debtors and Debtors-in-Possession for an Order (I) Authorizing, but not Directing, the Debtors, in the Exercise of Their Business Judgment, to Pay the Prepetition Wages, Salaries and Benefits of the Employees, (II) Authorizing the Debtors to Continue Employee Benefit Programs in the Ordinary Course of Business, and (III) Directing All Banks to Honor Prepetition Checks for Payment of Prepetition Wage, Salary and Benefit Obligations**

50.    By motion filed concurrently herewith, the Debtors are requesting that the Court enter an order (i) authorizing, but not directing, the Debtors, in the exercise of their business judgment, to pay the prepetition wages, salaries and benefits of the Employees; (ii) authorizing, but not directing, the Debtors to continue employee benefit programs in the ordinary course of business; and (iii) authorizing, but not directing, applicable banks and other financial institutions

to process and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors relating to the foregoing (the "Employee Motion").

51.     Prior to the Petition Date, the Debtors employed six (6) employees on the payroll (collectively, the "Employees").    The average gross bi-weekly payroll for the Debtors' Employees, based upon historical data, is approximately $53,020.83.  The prepetition obligations that are the subject of this Motion are approximately $30,000, in aggregate, and each of the claims of the Employees will fall below the $10,950 cap imposed by section 507(a)(4) of the Bankruptcy Code.

52.     To minimize the personal hardship the Employees may suffer if Employee-related obligations are not paid when due, the Debtors, by their Employee Motion, seek authority (but not direction) to pay certain pre-petition claims for, among other items, wages and salaries, federal and state withholding taxes, payroll taxes, payments under Employee benefit programs and certain other Employee benefits in the ordinary course of business and to continue to pay such obligations as they arise in the ordinary course of the Debtors' business (collectively, the "Employee Obligations").

53.     I believe that the ability of the Debtors to preserve and maximize the value of their businesses as a going-concern and their ability ultimately to reorganize is dependent to some extent upon the continued service, satisfaction, and loyalty of the Employees.  I submit, therefore, that the Debtors' estates and their creditors will be adversely affected if the Debtors are unable to retain the Employees.  Further, the amounts to be paid pursuant to the Employee Motion are reasonable compared with the importance and necessity of the Employees and the losses the Debtors likely will suffer if the Employee Obligations are not paid.

54.    Accordingly, I believe that approving the Debtors' request to pay or otherwise honor the Employees Obligations is important to the Debtors' ability to maximize the value of their assets and reorganize, and will in no way prejudice the rights of other unsecured creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  September 4, 2008                     /s/  Zachary H. Pashel_____
                                                    Zachary H. Pashel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of September, 2008, a copy of the foregoing was served by either (i) electronic transmission; (ii) hand delivery; or (iii) overnight delivery on the parties listed on the attached Service List.

/s/      Joel I. Sher
Joel I. Sher
Shapiro Sher Guinot & Sandler
36 S. Charles Street, 20th Fl.
Baltimore, MD  21201
(410) 385-0202

*Attorney for Luminent Mortgage Capital, Inc., et al.*